**NATIONAL ASSOCIATION OF DEMO-LITION CONTRACTORS, INC., Petitioner,**

v.

**Douglas M. COSTLE, Administrator, Environmental Protection Agency, Respondent.**

**Nos. 74–1545 and 75–2078.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 15, 1977.

Decided Oct. 13, 1977.

Stanley M. Lipnick, Chicago, Ill., with whom Burton Y. Weitzenfeld, Chicago, Ill., and John F. McCabe, Jr., Washington, D. C., were on the brief, for petitioner.

John E. Bonine, Associate Gen. Counsel, Environmental Protection Agency, Washington, D. C., for respondent. Peter R. Taft, Asst. Atty. Gen., and Patrick A. Mulloy, Atty., Dept. of Justice, Washington, D. C., were on the brief for respondent.

Before WRIGHT, ROBINSON, and MacKINNON, Circuit Judges.

Opinion for the court filed by WRIGHT, Circuit Judge.

J. SKELLY WRIGHT, Circuit Judge:

The National Association of Demolition Contractors, Inc. (NADC) seeks review of amendments promulgated in 1974 and 1975 by the Administrator of the Environmental Protection Agency (EPA) to regulations

governing demolition of buildings which contain asbestos. For reasons which we detail below, we cannot agree with petitioner that the Administrator has abused his discretion or acted arbitrarily, capriciously, or contrary to law, and we therefore uphold the validity of the amendments.[1]

I

Section 112 of the Clean Air Act, 42 U.S.C. § 1857c-7 (1970), *as amended*, Pub. L.No. 95–95 § 110, 91 Stat. 703 (Aug. 7, 1977), requires the Administrator of EPA to designate "hazardous air pollutants"—pollutants which "may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness"—and to establish standards to control such pollutants "at the level which in his judgment provides an ample margin of safety to protect the public health * * *." Asbestos was included in the first list of hazardous air pollutants published by the Administrator in March 1971, 36 Fed. Reg. 5931 (1971), and proposed standards for asbestos emissions were published later that year, *id.* at 23239. After receiving comments and holding hearings throughout the country, *id.* at 23981, the Administrator promulgated final regulations in 1973, 38 Fed. Reg. 8820 (1973), JA 28. In the preamble to these regulations the Administrator concluded that, while "[a]sbestos is too important in our technology and economy for its essential use to be stopped," its known serious

effects and the uncertainty of the "dose-response curve" required "that the major sources of man-made asbestose [*sic*] emissions into the atmosphere be defined and controlled." *Id.* Relying primarily on a report of the National Academy of Sciences (NAS), the Administrator found that demolition of institutional, industrial, and commercial buildings or structures containing friable asbestos—asbestos capable of crumbling or being reduced to a powder and emitted into the air—was one of five major sources of asbestos emissions. *Id.* at 8821, JA 29.[2] Accordingly, the regulations required that notice be provided to the Administrator prior to demolition of a building containing friable asbestos and that prescribed procedures for wetting and removal of materials containing asbestos be followed. *Id.* at 8829, JA 36.

In 1974 and 1975 amendments to these regulations were promulgated. The 1974 amendments reduced the notice period required prior to demolition and permitted removal of certain units without first stripping and wetting the asbestos. 39 Fed. Reg. 15398 (1974), JA 91. Petitioner promptly sought review of these amendments, but proceedings were delayed after the court was informed that EPA was in the process of further amending the regulations. The 1975 amendments, which were the product of this rulemaking, refined the "wet and remove" requirements. Friable asbestos was defined, an exemption was

---

1. The standard of review is defined in § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2) (1970). *See Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 541 F.2d 1 (*en banc*), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

2. According to petitioner, the NAS study in question was based on data dealing only with sprayed asbestos fireproofing, which is not present in most or all of the buildings now being demolished. NADC argues that current demolition does not generate asbestos emissions comparable to those involved where sprayed asbestos fireproofing is present, and thus that the NAS report provides no basis for concluding that building demolition is a "major source" of asbestos emissions. EPA disagrees with this characterization of the NAS report, and argues as well that the NAS report was not

the only basis relied upon by the Administrator in defining building demolition as a "major source." Whatever the merits of these respective claims, the argument ignores the fact that this court does not have jurisdiction to resolve issues arising out of the original rulemaking which could have been raised on review at the time. Section 307(b) of the Clean Air Act, 42 U.S.C. § 1857h-5(b) (Supp. V 1975), requires petitions for review to be filed "within 30 days from the date of * * * promulgation, approval, or action, or after such date if such petition is based solely on grounds arising after such 30th day." Clearly, then, the Administrator's reliance on the NAS report and the justifications for his original decision to treat demolition as a major source are not subject to review in this action.

provided where operations involved less than a specified amount of asbestos, and provision was made for wrecking companies to remove asbestos and demolish buildings portion-by-portion. Finally, the regulations established an exemption from the wetting requirement where demolition takes place at subfreezing temperatures. 40 Fed. Reg. 48299–48300 (1975), JA 246–247. NADC again sought review, and its challenges to the 1974 and 1975 amendments were consolidated into this action.[3]

## II

■ NADC first challenges the Administrator's refusal to perform newly developed tests at demolition sites which might establish that demolition is not a "major source" of asbestos emissions and therefore should not be regulated under the Administrator's policy of controlling only "major sources" of emissions. At the time the original regulations were proposed and promulgated, no means were available to measure the actual amounts of asbestos emitted from unenclosed sources, including demolition sites. Since that time, under the auspices of EPA, testing technology has improved, and the Administrator has made use of newly developed tests to measure asbestos emissions in other types of unenclosed projects such as waste disposal sites. *See* Background Information on National Emission Standards for Hazardous Air Pollutants—Proposed Amendments to Standards for Asbestos and Mercury, Pub. No. EPA–450/2–74–009a (1974), at 52–72, JA 184–204 (hereinafter *Background Information*). But while EPA staff members conceded in late 1973, after the promulgation of the original amendments, that it would be feasible to perform these tests on demolition sites, *see* JA 98, the Administrator has refused petitioner's request that he do so. Rather, the preamble to the 1975 amendments states: "The Agency previously made the determination that building demolition is a major source of asbestos emissions, and no new information has been submitted to demonstrate that it is not a major source." 40 Fed. Reg. 48295 (1975), JA 242.

We have no occasion to consider whether petitioner's argument would be a meritorious one if the tests in question were established to be an accurate—or at least a relatively accurate—means of measuring asbestos emissions. For the fact is that their accuracy has in no way been established. Indeed, it is the inaccuracy of these tests, coupled with the dangers involved from emissions during the actual testing, which is the Administrator's justification for their not having been performed at demolition sites. According to one expert witness cited by the Administrator in the preamble to the 1975 regulation, "It is reasonable to assume an error in the count of fibers in both water and air of at least nine times on the high side to one-ninth on the low side." Testimony of Dr. Arnold Brown, quoted at 40 Fed. Reg. 48296 (1975), JA 243. More-

---

**3.** One of the central issues originally raised by NADC in its petition for review was whether the term "emission standard" as used in § 112 of the Clean Air Act refers only to a numerical standard. NADC argued that the authority of the Administrator under § 112 is limited to prescribing numerical standards defining the permissible level of emissions; even where numerical standards are not feasible, NADC contended, the Administrator lacks authority to impose "work practice" rules to regulate hazardous pollutants. Petitioner therefore requested this court to direct the Administrator to promulgate an "emission standard," as it defined the term, as opposed to a work practice rule.

The Clean Air Act Amendments of 1977, signed into law on August 7, 1977, amended § 112 to provide:

For purposes of this section, if in the judgment of the Administrator, it is not feasible to prescribe or enforce an emission standard for control of a hazardous air pollutant or pollutants, he may instead promulgate a design, equipment, work practice, or operational standard, or combination thereof, which in his judgment is adequate to protect the public health from such pollutant or pollutants with an ample margin of safety. * * * Clean Air Act Amendments of 1977, Pub. L. No. 95–95 § 110, 91 Stat. 703. While we have serious questions as to whether this court would have jurisdiction to review NADC's claim as to this issue in any event, *see* note 2 *supra*, counsel for NADC conceded the point at oral argument in view of the 1977 amendments.

over, evidence from tests which have been performed supports the Administrator's conclusion as to their utility: in one test readings from two different monitors at a single site taken at the same time showed asbestos concentrations of 2 and 12,700 ng/m$^3$ respectively. *See Background Information, supra,* at 67, JA 199. Because of the undisputed inaccuracy of this testing methodology, we cannot find the Administrator's refusal to perform these tests at demolition sites, with a view toward ending regulation on the basis of the results, to be arbitrary, capricious, or an abuse of his discretion.

### III

 Petitioner also challenges the Administrator's reliance on a scientific report which was not in the administrative record as a basis for continuing regulation of demolition projects. In the preamble to the 1975 amendments quoted earlier, the Administrator, after noting that "no new information" had been submitted to establish that demolition was not a major source of asbestos emissions, went on to state:

Demolition and renovation operations generate short-term exposure of urban populations to asbestos. Since promulgation of the demolition regulations on April 6, 1973, new biological evidence supporting the significance of single short-term exposures has been obtained. One-day inhalation exposures in animal experiments have produced an increase in the incidence of mesothelioma. (Wagner, J. C., Berry, G., and Timbrell, V., "The Effects of the Inhalation of Asbestos in Rats", *Br. J. Cancer* 29, pp. 252–269, 1974). * * *

40 Fed. Reg. 48295, JA 242.

We have repeatedly emphasized that informal rulemaking conducted according to the Administrative Procedure Act mandates "an *exchange* of views, information, and criticism between interested persons and the agency." *Home Box Office, Inc. v. FCC,* 185 U.S.App.D.C. ——, ——, 567 F.2d 9, 35 (decided March 25, 1977) (*per curiam*) (emphasis in original), *cert. denied,* —— U.S. ——, 46 U.S.L.Week 3190 (Oct. 3, 1977); *see Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 326–327, 486 F.2d 375, 393–394 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). As a result, we have sought to "tread cautiously" in weighing agency requests to supplement a record after promulgation of a challenged rule, bearing in mind that "information on such events reaches a reviewing court untested by any procedures, such as an administrative hearing, designed to assure its accuracy and completeness." *Amoco Oil Co. v. EPA,* 163 U.S.App.D.C. 162, 501 F.2d 722, 729 n.10 (1974). In this case, however, petitioner has not contended that it is aware of other studies or reports which reach conclusions at odds with those reached in the study relied upon by the Administrator. Absent such information, we can see little purpose to be served in requiring the Administrator to reopen the proceedings at this time. But should petitioner discover new information, we think the Agency has the responsibility, in the first instance, to reconsider and resolve such questions.[4]

---

4. This approach is consistent with that established by the Clean Air Act Amendments of 1977, Pub. L. No. 95–95, § 305, 91 Stat. 775, governing rules proposed 90 days or more after enactment of the amendments. That section provides in part:

Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit * * *. Such reconsideration shall not postpone the effectiveness of the rule. * * *

## IV

Finally, petitioner challenges the Administrator's limitation of the exemption from wetting asbestos to demolition which takes place at subfreezing temperature. After promulgation of the original "wet and remove" requirements in 1973, demolition contractors informed the Administrator that compliance with the wetting requirement at subfreezing temperatures produced hazardous footing conditions for workers on the sites. *See Background Information, supra*, at 17–18, JA 149–150. Regulations were then proposed, 39 Fed. Reg. 38066 (1974), JA 120, and promulgated, 40 Fed. Reg. 48300 (1975), JA 247, which provided a suspension of the requirements for wetting asbestos insulation and fireproofing during stripping from a building when the temperature is below freezing. In the preamble to the promulgated regulation the Administrator explained the limited exemption:

> The alternative was proposed because, in the judgment of the Agency, worker safety would be unduly jeopardized by the unsafe footing caused by ice formation from water use under freezing conditions. The proposed alternative is less restrictive on demolition contractors than a second course of action that was considered, namely the prohibition of demolition under freezing conditions. * * * [T]he promulgated demolition provisions are based on the use of the best available emission control methods at all temperatures, and these methods are different for nonfreezing and freezing conditions.

40 Fed. Reg. 48295, JA 242.

NADC argues that the Administrator's statutory mandate to protect the public health with "an ample margin of safety" is inconsistent with his decision to use the "best available control methods at all temp-

eratures." According to petitioner, since asbestos emissions do not vary with temperature, if wetting is not required to protect the public health with "an ample margin of safety"—and NADC reads the suspension at subfreezing temperatures to establish that it is not—then it can never be required. We disagree.

Protection of the public with "an ample margin of safety" may necessitate use of different control measures, including use of the "best available control methods," in different conditions. Petitioner has nowhere argued that the alternative, subfreezing method is *as* effective in controlling emissions as the generally required "wet and remove" method.[5] And the Administrator neither found nor implied by his allowance of a limited exemption that use of this alternative method *at all times* would amply protect the public health. The Administrator was not convinced that the drastic measure of complete prohibition of demolition in subfreezing temperatures, for purposes of ensuring worker safety, was justified. 40 Fed. Reg. 48295, JA 242. But in view of the unreliability of available tests, the Administrator could not be confident that regular use of a relaxed alternative procedure would amply protect the public health. Under the circumstances, the Administrator's choice to employ alternative methods was well within the bounds of his discretion. The record and argument before us provide no basis for concluding that the Administrator, in providing a limited exception to the wetting requirement to protect worker safety, acted in anything other than a reasonable fashion, consistent with law.

We therefore hold with respect to this challenge, as with the others raised by petitioner, that the Administrator's action must be upheld.

*Petitions for review denied.*

---

**5.** Section 110 of the Clean Air Act Amendments of 1977, Pub. L. No. 95–95, 91 Stat. 703, provides:

If after notice and opportunity for public hearing, any person establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant *at least equivalent* to the reduction in emissions of such air pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

(Emphasis added.)