**NORTHSIDE SANITARY
LANDFILL, INC.**

v.

**Lee M. THOMAS, Administrator U.S. Environmental Protection Agency, and U.S. Environmental Protection Agency.**

No. 84–1586.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 14, 1988.

Decided June 28, 1988.

Warren D. Krebs, Lebanon, Ind., for petitioner.

Lawrence E. Blatnik, Atty. Dept. of Justice, with whom Roger J. Marzulla, Acting Asst. Atty. Gen., and Francis S. Blake, Gen. Counsel, Mark Greenwood, Asst. Gen. Counsel, and Lawrence E. Starfield, Atty., E.P.A., Washington, D.C. were on the brief, for respondents.

Before ROBINSON and SENTELLE, Circuit Judges and KAUFMAN,* Senior District Judge.

---

* Of the United States District Court for the District of Maryland, sitting by designation pursuant to 28 U.S.C. § 294(d).

Opinion for the Court filed by Senior District Judge FRANK A. KAUFMAN.

FRANK A. KAUFMAN, Senior District Judge.

Petitioner, Northside Sanitary Landfill, Inc. (Northside), seeks review of an order of the Environmental Protection Agency (the EPA or agency) which placed a hazardous waste site owned by Northside on the National Priorities List (NPL), and thereby made the site eligible for Superfund-financed remedial action pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601–57 (1982 & Supp. III 1985).[1] We have jurisdiction to review that EPA order, *id.* § 9613(a), and, for the reasons stated below, deny Northside's petition for review.[2]

## I. BACKGROUND

This case arises out of the EPA's continuing attempts to comply with the requirements of CERCLA, legislation "designed [by Congress] to address the growing problem of inactive hazardous waste sites throughout the United States." *Eagle–Picher Industries, Inc. v. EPA,* 759 F.2d 922, 925 (D.C.Cir.1985) (*Eagle–Picher II*). "To enable EPA to respond to those sites most urgently in need of cleanup, EPA is required under ... [CERCLA], 42 U.S.C. § 9605(8)(B), to compile the National Priorities List ("NPL") of releases or threatened releases" of hazardous substances across the country. *Id.* at 926. In order to pay for the cleanup of the sites, Congress created a fund known as the "Hazardous Substance Response Trust Fund," or, as it is commonly called, the "Superfund." 42 U.S.C. § 9631; *Eagle–Picher II,* 759 F.2d at 926 n. 1.

In deciding whether a given site belongs on the NPL, the EPA employs the "Hazardous Ranking System" (HRS), a scientific model designed to determine the relative hazard which that site presents. The EPA "applies the HRS to data from an observed or potential release [of hazardous waste] to obtain a 'score' or estimate of the risk from the release. The EPA then relies on HRS scores to determine which [sites] should be listed on the NPL." *Eagle–Picher I,* 759 F.2d at 910 (footnote omitted). A score of 28.5 or more leads to the inclusion of the site on the NPL. *Id.* at 910 n. 17.

When the EPA orders a site to be placed on the NPL, that site becomes eligible for remedial action financed by the Superfund, although the mere listing of the site on the NPL does not mean that the EPA will take such remedial action. *See* 40 C.F.R. § 300.68(a) (1987); *Eagle–Picher I,* 759 F.2d at 911 & n. 26. However, should the EPA take remedial action against a site listed on the NPL, past and present owners of the site become liable

---

**1.** The description of CERCLA set forth in this opinion contains those principles essential to an understanding of this case. We have already commented extensively with regard to what Judge Starr has aptly termed the "complex web of 'Superfund' legislation." *Eagle–Picher Industries, Inc. v. EPA,* 759 F.2d 922, 925 (D.C.Cir. 1985) (*Eagle–Picher II*). The three *Eagle–Picher* decisions of this court provide a useful introduction to the background, interpretation, and application of the Superfund legislation. *See Eagle–Picher Industries, Inc. v. EPA,* 759 F.2d 905 (D.C.Cir.1985) (*Eagle–Picher I*); *Eagle–Picher II, supra; Eagle–Picher Industries, Inc. v. EPA,* 822 F.2d 132 (D.C.Cir.1987) (*Eagle–Picher III*).

After the events which are the subject of this petition occurred, Congress amended CERCLA, enacting the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. No. 99-499, 100 Stat. 1613. Those amendments were intended to "revitalize the Superfund program." H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 54,

*reprinted in* 1986 U.S.CODE CONG. & ADMIN.NEWS 2835, 2836. Most of SARA went into effect on October 17, 1986; however, some of SARA's provisions did not become effective until January 1, 1987. *See* 42 U.S.C. § 9601 note. As part of SARA, Congress redesignated the "Hazardous Substance Response Trust Fund" as the "Hazardous Substance Superfund," repealed 42 U.S.C. § 9631, and relocated the substance of that provision in the Internal Revenue Code, 26 U.S.C. § 9507.

SARA does not affect the listing status of the hazardous waste site owned by Northside. Except as otherwise indicated in this opinion, we refer to the provisions of CERCLA which were in effect at the time the Northside site was listed on the NPL.

**2.** We entered an Order granting judgment for the EPA on March 25, 1988, and noted in that Order that this opinion would follow.

for the cost of the cleanup. 42 U.S.C. § 9607(a); *Eagle–Picher II,* 759 F.2d at 926 n. 1. The initial version of the NPL was promulgated as a final rule of the EPA on September 8, 1983.[3] The list, as required by Congress, is revised to include new sites "no less often than annually." 42 U.S.C. § 9605(8)(B).

## II. FACTS

Northside owns and operates a 131–acre hazardous waste site near Zionsville, Indiana (the Northside site). The Northside site was included as part of the EPA's first annual revision to the NPL, which was published in the form of a proposed rule on September 8, 1983. *See* 48 Fed.Reg. 40,-674–82 (1983). Pursuant to 5 U.S.C. § 553(c),[4] the EPA allowed interested parties, including Northside, to comment upon the proposed revision, and gave them until November 7, 1983 to do so. 48 Fed.Reg. 40,674 (1983).

Despite the November 7, 1983 deadline, Northside did not comment upon its site's inclusion in the NPL revision until more than two and one-half months after the comment period had officially closed. On January 31, 1984, the EPA received from Northside 420 pages of documents consisting of various geological studies, water quality evaluations, and correspondence pertaining to the Northside site. The documents were accompanied by a letter dated January 26, 1984 from Jonathan W. Bankert, president of Northside, asking that "the Agency review these documents even though not summited [sic] by November 7, 1983 since we were not advised of that date." J.A. 516.[5] Although Bankert's letter briefly described each of the eleven

separate documents Northside was submitting, the letter did not in any way comment concerning the specific relationship between any of the documents and Northside's objections to the way in which the EPA had applied the HRS when scoring the Northside site. Nor were specific statements about the relationship between the documents and the HRS contained in the documents submitted to the EPA along with Bankert's letter.

Even though Northside's comments were untimely filed, the EPA did review those comments and prepared a fourteen and one-half page response to them. *See* J.A. 469–83. Because Northside had not made any specific statements about the purpose of its comments in Bankert's letter or elsewhere, the EPA was forced to make certain assumptions about the documents which Northside had submitted:

These documents include results of geologic surveys and water quality evaluations pertaining to ground and surface water in the area around the [Northside] site. *Northside made no further specific comments, based on the documentation, regarding the scoring factors on which the HRS score for this site was based. For this reason, EPA's response addresses only major findings or conclusions presented in the documents which relate to the HRS score and subsequent listing of the site on the NPL* . . . .

In general, all of the documentation which was submitted appeared related to the linking of the contaminants found in samples of surface water and in on-site wells to the landfill and to indicate con-

---

3. 48 Fed.Reg. 40,658 (1983). The NPL, including subsequent revisions, is codified at 40 C.F.R. Part 300, App. B (1987). The NPL is promulgated in the form of a final rule under informal notice-and-comment rulemaking procedures. *See* 42 U.S.C. § 9605; 5 U.S.C. § 553(c).

4. Section 553(c) of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–59, 701–06 (1982 & Supp. III 1985), provides in relevant part:

After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making

through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. . . .

5. Despite this statement in Bankert's letter, Northside had been given notice concerning the date upon which the comment period closed because, as is indicated in the text of this opinion, that date was published in the Federal Register.

tamination is more likely migrating from the Envirochem site located to the north of Northside landfill.

J.A. 470 (emphasis added).

After reviewing Northside's comments, the EPA confirmed its previous conclusion that "the site has been properly scored as proposed and is eligible for listing on the NPL." J.A. 483.[6] Accordingly, the Northside site was included in the first annual revision of the NPL when the latter was promulgated as a final rule on September 21, 1984. 49 Fed.Reg. 37,070–90 (1984).[7] Northside did not request the EPA to reconsider its ruling, although it had the right to do so. *See* 5 U.S.C. § 553(e).[8] Instead, Northside instituted this suit in this court to attack its inclusion on the NPL.

### III. DISCUSSION

■ Northside challenges the EPA's order on a variety of substantive and procedural grounds. Essentially, Northside contends that (1) the Northside site cannot be listed on the NPL because portions of that site had already been granted interim status under the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901–91i (1982 & Supp. III 1985); (2) the documentation in the record does not support the score which the Northside site received under the HRS; and (3) in scoring the Northside site, the EPA deviated from certain internal quality control procedures. The EPA disagrees on the merits with all of Northside's claims. Furthermore, the EPA contends that this court should refuse to consider Northside's objections because Northside failed properly to raise them during the rulemaking proceeding. We agree with the EPA that, by neglecting timely to put the EPA on proper notice of its objections, Northside has forfeited its right to

have this court examine those objections on the merits.

■ While Northside did submit 420 pages of documents to the EPA, it made no attempt to specify *why* it considered those documents or anything in them relevant to the rulemaking procedure. Northside contends that the notice-and-comment rulemaking provisions of 5 U.S.C. § 553(c) do not require such specificity. Northside apparently believes that the mere submission of voluminous documentation to the EPA is enough to put the EPA on notice of all possible reasons why a site should not have been included on the NPL. But common sense and case law dictate that Northside should have assumed at least a modicum of responsibility for flagging the relevant issues which its documentary submissions presented. As Judge Leventhal has noted:

[C]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern. *The comment cannot merely state that a particular mistake was made ...; it must show why the mistake was of possible significance in the results [the agency reaches].*

*Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375, 394 (D.C.Cir.1973), *cert. denied sub nom. Portland Cement Ass'n v. Administrator, EPA,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974) (emphasis added).

In *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), then-Justice Rehnquist expressed the unanimous opinion of seven members of the Supreme Court[9] that a party such as Northside has the burden of clarifying its position for the

---

**6.** The Northside site received a score of 46.04, J.A. 483, well above the score of 28.5 required for inclusion on the NPL. The Northside site is ranked 237th out of the 703 sites listed on the current version of the NPL. 40 C.F.R. Part 300, App. B (1987).

**7.** The Northside site is specifically listed at 49 Fed.Reg. 37,084 (1984).

**8.** Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

5 U.S.C. § 553(e). For further discussion, see *infra* note 11.

**9.** Neither Justice Powell nor Justice Blackmun took part in the decision of *Vermont Yankee.*

EPA.[10] Even though the EPA has the statutory obligation to consider fully significant comments, "it is still incumbent upon intervenors who wish to participate [in a licensing proceeding] to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." 435 U.S. at 553, 98 S.Ct. at 1216. Justice Rehnquist then quoted with approval Judge Leventhal's remarks in *Portland Cement, id.*, and concluded that

> administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure references to matters that "ought to be" considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters "forcefully presented."

*Id.* at 553–54, 98 S.Ct. at 1217.

Applying those principles to Northside's petition for review, it is quite clear that Northside's comments did not alert the EPA to any of the contentions which Northside presses before us. President Bankert's transmittal letter did nothing more than list the titles of the documents enclosed with it. Neither Bankert's letter nor any of the documents submitted with it made clear the objections which Northside now contends that it was making. Indeed, as the EPA's response to Northside's comments reveals, Northside's documents lend themselves to an interpretation of Northside's objections which, although not what Northside intended, is still entirely consistent with the types of objections which a

party might make when a hazardous waste site which it owns is listed on the NPL.

It is certainly incumbent upon the EPA under 5 U.S.C. § 553(c) to "respond[ ] in a reasoned manner to significant comments received." *United States Satellite Broadcasting Co., Inc. v. FCC*, 740 F.2d 1177, 1188 (D.C.Cir.1984); *see also, e.g., Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 & n. 58 (D.C.Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). But the "dialogue" between administrative agencies and the public "is a two-way street." *Home Box Office*, 567 F.2d at 35. Just as "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public," *id.* at 35–36 (footnote omitted), so too is the agency's opportunity to *respond* to those comments meaningless unless the interested party clearly states its position. *See Wisconsin Electric Power Co. v. Costle*, 715 F.2d 323, 326 (7th Cir.1983) ("the rules of administrative law apply across the board, to agencies and interested parties alike").

We hold that when Northside submitted its comments to the EPA, Northside should have been specific as to why and how it thought the 420 pages of documents were relevant to the scoring of the Northside site. We are not suggesting that Northside should have commented in great detail on every study, but we do conclude that Northside could and should have done far more than it did do to alert the EPA to its positions, which would have then required and allowed the EPA fully to consider Northside's version of the facts, and to act upon them appropriately.[11] We therefore

---

**10.** *Portland Cement* and *Vermont Yankee* arose in somewhat different contexts. *Portland Cement* involved the propriety of proposed EPA regulations under the Clean Air Act, 42 U.S.C. §§ 7401–7642 (1982 & Supp. III 1985), regarding the standards of performance for Portland cement plants. At issue in that case was an interested party's right to comment under 5 U.S.C. § 553(c) concerning the methodology which the EPA had used in establishing those standards. Justice Rehnquist's comments in *Vermont Yankee* are addressed to the application of the National Environmental Policy Act, 42 U.S.C. §§ 4321–70a (1982 & Supp. III 1985) in a licensing context and indicate the thorough-

ness with which the EPA must consider the environmental impact of a proposed action in the light of the comments which interested parties make about that action.

**11.** At the very least, Northside itself could have pointed out those facts which it believed that the EPA had overlooked in the EPA's response to Northside's comments. Specifically, when Northside received the EPA's response to its comments, it was on notice that the EPA had not interpreted those comments as Northside evidently expected the agency would. At that point, pursuant to 5 U.S.C. § 553(e), *see* note 8, *supra*, Northside was free to petition the EPA to

conclude that the EPA's failure to respond to the specific issues which Northside asserts were presented by its comments was neither arbitrary nor capricious. *See Home Box Office,* 567 F.2d at 35–36 n. 58. We agree with the EPA that Northside never presented its objections to the agency in a way which could reasonably have permitted the agency to examine those contentions.

Because Northside did not properly present its objections to the EPA during the rulemaking process, we will not address the merits of those objections. *Eagle–Picher III,* 822 F.2d at 146; *see also, e.g., Natural Resources Defense Council, Inc. v. Thomas,* 805 F.2d 410, 427–28 (D.C. Cir.1986); *Washington Ass'n for Television and Children v. FCC,* 712 F.2d 677, 680–82 (D.C.Cir.1983). However, we note that were we to reach those merits, we would still deny Northside's petition for review because the EPA's decision to place the Northside site on the NPL finds ample support in the record before us. Thus, in our view, the EPA's decision was in no way arbitrary or capricious. *See Eagle–Picher I,* 759 F.2d at 921 (setting forth the standard of review for decisions concerning NPL). Accordingly, we hereby confirm our Order of March 25, 1988 affirming the EPA's placement of the Northside site on the NPL, and denying Northside's petition for review thereof. The petition is

*Denied.*

---

reconsider its position concerning those comments in the light of the specific objections which Northside now raises before this court.

*See Wisconsin Electric,* 715 F.2d at 327–28. However, Northside did not take advantage of that opportunity.