Steven O'DELL, Jana O'Dell, Tim O'Dell, Paul O'Dell,

Ruby Bridges, et al., Appellants,

v.

HERCULES INCORPORATED, Appellee.

Steven O'DELL, Jana O'Dell, Tim O'Dell, Paul O'Dell, Appellants,

Ruby Bridges, et al.,

v.

HERCULES INCORPORATED, Appellee.

Nos. 88–1958, 88–2123.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 14, 1989.

Decided May 10, 1990.

---

Phillip H. McMath, Little Rock, Ark., for appellants.

Eugene Partain, Atlanta, Ga., for appellee.

Before LAY, Chief Judge, BOWMAN and MAGILL, Circuit Judges.

MAGILL, Circuit Judge.

Appellants, the Bridges[1] and the O'Dells,[2] appeal the district court's[3] order[4] denying a new trial, after the liability phase of a jury trial in consolidated and bifurcated Arkansas personal injury and property damage actions alleging exposure to dioxin, a by-product of Agent Orange manufacturing. 687 F.Supp. 450. The jury, in returning a verdict in favor of Hercules, Incorporated (Hercules),[5] found that Hercules had not created a risk of harm to the health of any of the plaintiffs and had not been negligent. The district court's final order denied appellants' motions requesting a new trial on grounds that the method of bifurcation, limitations on proof, introduction of inadmissible evidence, and exclusion of admissible evidence constituted abuses of judicial discretion.

1. The *Bridges* case involved 95 plaintiffs who alleged exposure to toxic chemicals from the Graham Road and Rogers Road landfills, located in or near their residential neighborhoods.

2. The *O'Dell* case involved four plaintiffs who alleged exposure to toxic chemicals as a result of breathing, touching and ingesting contaminated air and soil from a chemical plant site and area landfills.

3. The Honorable Carl B. Rubin, Chief United States District Judge for the Southern District of Ohio, sitting by designation in the Eastern District of Arkansas.

4. Order, No. LR–C–86–435 (June 15, 1988).

5. The action was originally brought against Hercules and Vertac, Inc. During trial the plaintiffs settled with Vertac.

This appeal is taken from the denial of a new trial. Appellants do not contest the judgment on the jury verdict in favor of Hercules. We affirm.

I.

From 1962 through 1969, Hercules produced Agent Orange [6] at a chemical manufacturing plant in Jacksonville, Arkansas. Beginning in 1971, Transvaal, Inc. (Transvaal), a functioning subsidiary of Vertac Chemical Corporation (Vertac), leased the plant from Hercules. Transvaal purchased the facility in 1976.

Hercules and Vertac disposed of chemical waste [7] on the plant site and in the Graham Road and Rogers Road landfills, operated by the city of Jacksonville and located in North Pulaski County, Arkansas. The Rogers Road landfill had been closed by the city of Jacksonville in 1959. However, unofficial dumping occurred at Rogers Road. The Graham Road landfill operated from 1959 to 1973.

Leaking drums of stillbottoms were buried on the plant site and disposed of in the landfills. Chemical waste had been poured into trenches in a marshy area and also buried. The trenches led into Rocky Branch Creek [8] and contaminated the ground water. In addition, drums were often taken off the sites and used by the general public. Chemical contents of these drums were burned in the open air. Neighborhood children played on the sites. No warning signs or fences existed at the landfills.

In 1979, eight years after Hercules ceased operation of the plant site, the Centers for Disease Control (CDC) conducted four separate exposure and endangerment studies and reported that the dioxin releases and levels in the environment around the plant site and the landfills created a significant risk to public health. A United States district court in eastern Arkansas ordered Vertac to undertake remedial action to arrest the chemical leakage from the disposal sites. *United States v. Vertac Chem. Corp.*, 489 F.Supp. 870 (E.D. Ark.1980) (preliminary injunctive relief).[9] ADPCE had compiled a Technical Data Summary (TDS) in 1982 and listed the plant site as

**6.** Agent Orange is a toxic defoliant made from a mixture of two herbicides, 2,4,-D and 2,4,5–T, which was used in East Asia during the Vietnam conflict. In 1979, the United States Environmental Protection Agency (EPA) restricted 2,4,-5–T and its production was discontinued.

During the Agent Orange manufacturing process, dioxin, 2,3,7,8–TCDD, was formed as a by-product of the intermediate chemical reaction to formulate 2,4,5–T. Dioxin is persistent in the environment, bio-accumulates in living tissue, has low water solubility and an affinity for soils and lipids. Dioxin has demonstrated carcinogenic, teratogenic, fetotoxic and mutagenic properties in animals and, arguably may be a promoter of cancer in humans.

Dioxin and other impurities were extracted with toluene, an organic solvent. In order to reuse the solvent, the extracted material underwent a distillation process producing residue (stillbottoms) in which extremely high levels of dioxin were found. Reactions habitually "ran away" releasing the contents of the reaction into the air. Hercules and Vertac experienced releases, spills, leaks and explosions during their respective periods of operation of the plant site.

**7.** Employees and ex-employees of Vertac testified for the plaintiffs that they disposed of chemical waste on the plant site and transported chemical waste to the landfills. According to the testimony, Hercules dumped an average of

three tons of chemical residue containing dioxin per week. In addition, methanol residue, 2,4-D production residue, 2,4–D and 2,4,5–T and chemically laced dirt were discarded. Both Hercules and Transvaal buried drums on the plant site according to eye witness testimony.

**8.** Rocky Branch Creek is a small stream which flows from the plant site through a residential area, a public park and ultimately into the Arkansas River. Hercules utilized the Creek to create a cooling water pond from which water was pumped for use in the plant's cooling process. Previously, Hercules had discharged waste water directly into the Creek until the Arkansas Department of Pollution Control and Ecology (ADPCE) ordered the process to cease. Hercules then implemented a neutralization system which often overflowed into the Creek. Hooking up to the local sewage treatment plant proved inadequate. Chemicals remained in the discharge.

**9.** The district court found that Hercules had not been in possession or control of the plant site and that Vertac had control of and operated all facilities at the plant site since October 1, 1971. *Id.* at 878–79. Since Hercules had not been on the site for several years and had no ownership interest in the property at the time, the district court declined to order Hercules to undertake any remedial actions. *Id.* at 888.

"contaminated" because of the presence of 2,4,-D, 2,4,5–T and dioxin. The district court subsequently ordered Vertac to immediately implement a remedial plan. *United States v. Vertac Chem. Corp.*, 588 F.Supp. 1294 (E.D. Ark.1984). The 1985 EPA Field Investigation Team (FIT) report indicated high levels of dioxin in both landfills. The EPA placed both landfills on the 1985 National Priority List (NPL)[10] for Superfund Clean-up, sixteen years after Hercules ceased producing Agent Orange and dumping chemical waste from the process in the landfills.

## II.

The ninety-five Bridges plaintiffs were present and former residents of the vicinity in and around the Graham Road and Rogers Road landfills. On June 25, 1985, the Bridges plaintiffs commenced an action claiming exposure to toxic chemicals, and alleging that defendants knowingly dumped toxic chemical manufacturing waste without warning area residents and allowed toxic chemicals to escape into the air, ground and water.

The four O'Dell plaintiffs had lived near the plant site since 1973. Steven and Jana O'Dell also lived adjacent to the Graham Road landfill. On August 1, 1986, the O'Dells filed a complaint alleging exposure to toxic chemicals from the landfills and subsequently filed an amended complaint further alleging exposure from the plant site.[11]

Hercules moved without opposition to consolidate the two cases and bifurcate the liability and damages issues for purposes of trial. The district court granted consolidation. Bifurcation was granted by the trial court. However, no formal bifurca-

tion order detailing specific findings in support of bifurcation was entered. Plaintiffs' subsequent motion to sever was denied.

At the pretrial conference, the trial court limited the proof in phase I of the trial to evidence pertaining to the issues of generic causation and liability.[12] The trial court defined the general standard of proof for phase I and advised counsel of its intent to consider the admissibility of specific evidence when proffered. The trial court ruled that the central issue was causation and the parties were to produce evidence bearing on whether Hercules, by its emissions of a dangerous substance, caused a health or economic hazard in the air, surface water, ground water, or soil in sufficient quantities to cause injury.

In phase I, the trial court permitted generic proof of plaintiffs' exposure to toxic chemicals in the form of significant routes of exposure. Plaintiffs' experts[13] testified that exposure may have been significant and would have created health risks. Defendant's expert, Dr. Raymond Harbison, testified to the contrary that no health risk existed based on estimations of the exposure of a hypothetical O'Dell plaintiff.

Phase I of trial extended from February 15, 1988 to February 29, 1989, producing 2,213 pages of transcript and 619 voluminous trial exhibits. Plaintiffs called seventeen of the twenty-seven trial witnesses. Ex-employees of both Hercules and Vertac testified to actually physically carrying chemical waste materials to the landfills. Tr. at 247–545.

Plaintiffs' expert, Dr. Morris Cranmer, an environmental toxicologist and consultant, who had done work for the EPA, Hercules and Vertac, and served as Director of the National Center for Toxicolo-

---

**10.** The NPL is compiled annually by the EPA, pursuant to 42 U.S.C. § 9605(8)(B) (1980), through the application of the Hazardous Ranking System (HRS), which scientifically assesses the relative risk of release created by a site.

**11.** The O'Dells claimed they were exposed to toxic chemicals from the plant site through breathing, touching and ingesting contaminated soil and air. According to the O'Dells, children played in the dirt, waded through chemical seeps and swam in the cooling pond on plant

property. The O'Dells waded and swam in Rocky Branch Creek and fished in Lake Dupree.

**12.** Although Judge Rubin invited briefs, only Hercules responded, addressing the proof to be introduced in phase I.

**13.** Dr. Carl Stapleton, an environmental health specialist, and Dr. Morris Cranmer, a toxicologist, testified for plaintiffs.

gy Research, testified that the landfills had been placed on the EPA's 1985 NPL. He was permitted to testify regarding the chemical nature of the dioxin, 2,3,7,8–TCDD, its function in the Agent Orange manufacturing process, and its persistence in the environment. He also testified regarding the toxicity (i.e., adverse health effects on organisms) of dioxin, due to both acute and chronic exposure. He classified dioxin in his expert opinion as a carcinogen. On the basis of epidemiological studies, he also testified that he believed dioxin was genotoxic, hepatotoxic, neurotoxic, and teratogenic. Specifically, he testified regarding the neurotoxic epidemiological effects of dioxin prior to 1971. Dr. Cranmer was not precluded from analyzing the 1985 FIT reports [14] on the landfills and detailing the methodology employed in the investigation. He expressed his belief that data from the FIT reports was insufficient for accurate modeling (i.e., defining the degree of harm possible under certain circumstances). He additionally commented on the probability of adverse health effects for persons living near the landfills, during their period of operation, to receive waste material from 2,4–D and 2,4,5–T production, but was precluded from testifying regarding the health records of individual plaintiffs. He commented on the toxicological significance (i.e., a variety of adverse health consequences) of exposure to levels of dioxin found by EPA and CDC reports on the plant site and landfills as well as environmental studies of the surrounding area. He also testified regarding a report he authored in 1980 regarding the compliance of the Vertac plant with Occupational Safety and Health Administration (OSHA) regulations.

Dr. Carl Stapleton, an environmental health scientist, testified about the relationship between the quality of the environment and the potential health effects that could occur when exposure to potential pollutants takes place. Dr. Stapleton testified regarding the FIT reports, the ADPCE TDS, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) HRS, and the CDC health assessments. Dr. Stapleton opined that "toxics have existed in quantities at that site and have been transported from the site and individuals have been exposed both on the site and off the site to these toxics that have posed a significant public health risk to those individuals." Tr. at 1226.

Without objections, the jury was instructed on risk of harm, negligence, and land-

---

**14.** Dr. Cranmer testified regarding the 1985 FIT reports as follows:

[T]he EPA FIT reports which provide information of levels as high as 30,000 parts per million of 2,4,5–T; ... 12 parts per billion of dioxin; high levels of 2,4,5–T;

. . . .

The FIT team recorded that in the early stages of the operation of these dump sites, ... burning was quite common. [T]he refuge [sic] would be brought to the site and would be set on fire and burned. [I]f you burn it, you're going to volatilize that material, produce smoke, and distribute it widely in the environment in high concentrations.

. . . .

[T]etrachlorobenzene, ... a precursor to 2,4,-5–T. [I]t's a toxic compound, but nowhere near as toxic as it would be if it was burned and converted to the TCDD.... So, we have the burning situation, which I consider to be an extraordinarily serious way of distributing toxic materials to the environment.
[A]fter the burning began to be curtailed, trenches were dug and the material was dumped into open pits.... So, now we have the ability of this material, which is not protected, to be in large quantities, ... to leave the site. Now, in addition, the operation of bulldozers and other types of excavating equipment would produce dust and this dust would carry off materials, as well. Finally, once the materials are entombed or covered over with dirt, you would have the leaching out of those materials into the ground water[.] [S]ite does flood badly and it allows the physical removal and moving around of barrels and other diversion. [D]uring the period of time that that site was operated, it was not secured. [P]eople could wander over there, the drums could be used for other purposes, such as barbecue pits or utility burning barrels, which further permitted exposures to these chemicals. [T]he FIT team report that there was significant evidence of ... human usage.... [T]here is a whole variety of ways that the materials on that site could have resulted in exposures to persons while they were on the site and also mechanisms by which the materials on that site could have gotten off the site and exposed people in the vicinity.
Tr. at 861–64.

owner liability. Tr. at 2175–82. The jury returned a verdict in favor of Hercules.[15] Judgment was entered on the verdict. The trial court denied plaintiffs' motion for a new trial and from this denial appellants appeal.

### III.

Appellants seek a new trial alleging four principal instances of prejudicial trial error in evidentiary rulings and in bifurcation.

■ Deciding a motion for a new trial is a matter committed to the sound discretion of the trial court. *McGee v. Hester*, 815 F.2d 1193 (8th Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987). Therefore, the district court's decision denying plaintiffs' motion for a new trial must constitute an abuse of discretion in order to undergo reversal by this court. *Green v. American Airlines, Inc.*, 804 F.2d 453 (8th Cir.1986); *Vassar v. Solem*, 763 F.2d 975 (8th Cir.1985); *Warner v. Transamerica Ins. Co.*, 739 F.2d 1347 (8th Cir.1984). *See generally* 11 C. Wright & A. Miller, *Federal Courts & Federal Practice* § 2818 (1973).

■ The trial court is in the best position to determine whether the alleged error affected the substantial rights of any party sufficient to warrant a new trial. Therefore, the trial court's decision deserves considerable deference. *Voegeli v. Lewis*, 568 F.2d 89 (8th Cir.1977). A trial court must determine whether an evidentiary ruling was so prejudicial as to require a new trial which would be likely to produce a different result. *Williams v. Mensey*, 785 F.2d 631 (8th Cir.1986); *Warner*, 739 F.2d at 1354. We may only find a trial court's determination of the admissibility of evidence was prejudicial where there has been a clear abuse of discretion. *Warner*, 739 F.2d at 1350.

After reviewing the trial court's evidentiary rulings and decision to bifurcate, we find no clear abuse of discretion based on these standards.

### IV.

■ First, appellants assert that error occurred when Hercules' defense counsel was permitted to call party plaintiff Steven O'Dell as an adverse witness and asked him a single question regarding his attitude toward risk associated with his prior use of controlled substances:

> Q: Now, I want to ask you about your attitude toward risk, because that is what your lawsuit alleges as to toxic chemicals.... Your attitude about exposing yourself to risk has not been such that you have been concerned about exposing yourself to the effects of marijuana and cocaine, am I correct?
>
> A: Not totally, sir.

Tr. at 1326. This question and answer was proceeded by two answers in which O'Dell conceded he had read and heard that cigarettes contain carcinogens and that cocaine can cause acute myocardial infarction. Tr. at 1328.

Appellants concede that the plaintiff's attitude toward risks from exposure to toxic chemicals was necessarily in issue, but argue that permitting inquiry into the witness' attitude toward the voluntary use of controlled substances was irrelevant and prejudicial.

Evidence is "relevant" if it tends to make the existence of any consequential fact more or less probable. Fed.R.Evid. 401.[16] There was extensive trial testimony regarding voluntary exposure to risks from, among other things, cigarettes, cyanide, arsenic and malathion. Tr. at 1316. Dr. Harbison testified without objection about

---

**15.** In response to special interrogatories, the jury unanimously found by a preponderance of the evidence that Hercules had not disposed of hazardous chemicals at the landfills or released hazardous chemicals from the plant site in amounts sufficient to create a risk of harm to property or persons. The jury also specifically found no negligence by Hercules regarding the release of chemicals.

**16.** Fed.R.Evid. 401 provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

the acute and chronic effects of controlled substance use. Tr. at 1569–70. Whether the risk of harm associated with exposure to dioxin was serious when compared with the risks associated with the voluntary use of controlled substances was a question of fact integral to a determination of risk of harm.

A court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403.[17] A district court's decision to admit relevant but potentially prejudicial evidence must be reviewed under an abuse of discretion standard. *Green v. American Airlines,* 804 F.2d 453 (8th Cir. 1986).

O'Dell was one of twenty-seven witnesses at trial, seven of whom were party plaintiffs. His testimony amounted to sixteen questions and lasted approximately ten minutes. On redirect, plaintiffs' counsel sufficiently rehabilitated O'Dell by asking whether he would have voluntarily suffered exposure to dioxin to which he responded negatively. The balance of redirect was confined to O'Dell's exposure to Hercules toxic chemicals. Tr. at 1330–33. The court instructed the jury that all plaintiffs' claims were to be considered independently, serving to negate any prejudicial effect. Tr. at 2179.

We conclude that the carefully controlled and closely scrutinized relevant inquiry into O'Dell's voluntary use of controlled substances was properly admitted on the causation issue going to the risk of harm, and not harmfully prejudicial sufficient to require a new trial. The trial court ruled defendant had a right to examine an adverse party; that O'Dell had alleged in his complaint toxic chemical exposure; that it would be reversible error not to permit the testimony; that Hercules was prohibited from inquiring into the subject matter of convictions; and that AMI instruction 105 would be given, to the effect that all plain-

tiffs' rights were separate and distinct and the claims of each party were to be treated as if separate lawsuits. Tr. at 1318–24. Instruction 105 was given. Tr. at 2179. Therefore, the trial court did not abuse its discretion in permitting the testimony.

## V.

Second, appellants assert that the bifurcation of the consolidated trial into liability (phase I) and damages (phase II), pursuant to Fed.R.Civ.P. 42(b),[18] was an abuse of discretion. On May 14, 1987, Hercules had moved for consolidation, phased discovery and a bifurcated trial. The Bridges filed a response on May 21, 1987, which in pertinent part consented to bifurcation in the manner suggested by Hercules. The O'Dells never filed a response. Therefore, Hercules' simultaneous motion to consolidate and bifurcate was not initially opposed and was granted September 24, 1987, without a formal order.

■ When a claim of improper bifurcation is asserted on appeal, the threshold question to determine is whether the appellant raised the issue below. *Johnson v. Helmerich & Payne, Inc.,* 892 F.2d 422, 424 (5th Cir.1990). *See also* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2390 (1971). Fed.R.Civ.P. 46 states that "[f]ormal exceptions to rulings or orders of the court are unnecessary; but ... it is sufficient that a party, ... makes known to the court ... [the] objection ... and the grounds therefor" (parenthetical added). Failure to object precludes appellate review absent a pure question of law. *Johnson,* 892 F.2d at 424. The Sixth Circuit in the *Johnson* case declined to review the propriety of a decision to bifurcate the liability and damages issues absent an objection on the record. In the instant case, no objection was made to bifurcation.

■ District courts possess broad discretion to bifurcate issues for purposes of trial

---

17. Fed.R.Evid. 403 provides that "[a]lthough relevant, evidence *may* be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, ..." (emphasis added).

18. Federal Rule of Civil Procedure 42(b) (1966) provides that "[t]he court, in *furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of* any claim, ... or of *any separate issue* ..." (emphasis added).

under Fed.R.Civ.P. 42(b). In exercising discretion, district courts should consider the preservation of constitutional rights, clarity, judicial economy, the likelihood of inconsistent results and possibilities for confusion. *Koch Fuels, Inc. v. Cargo of 13,000 Barrels of No. 2 Oil,* 704 F.2d 1038, 1042 (8th Cir.1983). It has long been established that this court should only reverse a district court's decision to bifurcate on a finding of a clear abuse of discretion. *Chicago, Rock Island & Pac. R.R. Co. v. Williams,* 245 F.2d 397, 404 (8th Cir.), *cert. denied,* 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed.2d 63 (1957).

This court has held that where the issues in a case are clearly separable, bifurcation is not an abuse of discretion. *Beeck v. Aquaslide 'N' Dive Corp.,* 562 F.2d 537 (8th Cir.1977) (separate trial solely on the issue of whether the product was manufactured by the defendant). Rule 42(b) bifurcation must be carefully considered where injury has an important bearing on liability. *Hosie v. Chicago North Western R.R. Co.,* 282 F.2d 639, 643–44 (7th Cir.1960), *cert. denied,* 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961).

■ We find appellants constructively waived their right to contest bifurcation by failing to raise an objection on the record below. Therefore, we need not reach the merits. However, we observe that the trial court's grant of bifurcation was not an abuse of discretion on the instant facts.

## VI.

Third, the appellants assert that the exclusion of certain evidence of injury and limitations of proof constituted error. Evidence of injury in fact pertaining to causation was relevant to the liability issue of whether defendant created a risk of harm and was consistently held admissible (i.e., Dr. Harbison's testimony regarding estimations of the exposure of a hypothetical O'Dell plaintiff). The trial court properly excluded other evidence of injury in fact (i.e., actual symptoms precipitated by burning of chemical waste, property value analyses, and subjective fear of the consequences of exposure) and limited proof (i.e.,

1974 plant explosions, instances of children playing on the plant site, dioxin levels in the municipal sewer system and Lake Dupree) which tended to prove damages only.

In *In re Bendectin Litig.,* 857 F.2d 290 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989), the Sixth Circuit, in the course of a properly bifurcated trial, considered plaintiffs' specific objections to the district court's evidentiary rulings on the admissibility of certain evidence and references allegedly pertaining to causation and established an abuse of discretion standard of review. *See also Johnson v. Ashby,* 808 F.2d 676 (8th Cir.1987); *In re Beverly Hills Fire Litig.,* 695 F.2d 207 (6th Cir.1982), *cert. denied,* 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983).

■ Appellants claim the trial court abused its discretion by failing to make clarifying rulings on the scope of proof admissible on liability. The lack of specific findings embodied in a formal bifurcation order, and the refusal on the part of the trial court to rule on the admissibility of evidence in advance, are relied upon by appellants in claiming that the issues were not adequately characterized, the type of expert testimony necessary was unclear, and the prohibition against the offering of proof of injury was inconsistently applied. The lack of specific findings embodied in a formal bifurcation order did not constitute an abuse of discretion. The issue of whether failure to enter a formal bifurcation order constitutes an abuse of discretion is a case of first impression for the federal courts of appeals. However, in *Helminski v. Ayerst Laboratories,* 766 F.2d 208 (6th Cir.), *cert. denied,* 474 U.S. 981, 106 S.Ct. 386, 88 L.Ed.2d 339 (1985), the Sixth Circuit considered a bifurcation order which was entered late and concluded that absent a showing of prejudice no abuse of discretion had occurred. A logical extension of *Helminski* would be to require a showing of prejudice in order for the lack of a formal bifurcation order to constitute an abuse of discretion. Though a bifurcation order may have clarified the scope of permissible areas of inquiry in

advance, we cannot find that the decision of the trial court to proceed via contemporaneous evidentiary rulings constituted an abuse of discretion.

## A. Irrelevant Evidence

■ The trial court properly excluded as irrelevant testimony of subjective fear resulting from alleged exposure to toxic chemicals, actual symptoms of injury resulting from the alleged burning of toxic chemical waste in the open air, and property marketability. This proposed testimony pertained only to damages and was properly excluded pursuant to Fed.R.Evid. 401.

The trial court also properly excluded testimony regarding Vertac explosions at the plant site in 1974. Vertac was no longer a defendant. This evidence was irrelevant and properly excluded under Fed.R. Evid. 401.

## B. Prejudicial Evidence

■ The trial court would not permit testimony regarding instances of children playing on the plant site or the introduction of evidence of dioxin levels present in the municipal sewer system and in Lake Dupree because of its prejudicial nature. We must review a district court's determination that evidence should be excluded as unfairly prejudicial under an abuse of discretion standard. *E.I. du Pont de Nemours & Co. v. Berkley & Co., Inc.*, 620 F.2d 1247 (8th Cir.1980).

Evidence alleging that children playing in the vicinity of the plants and on the landfills without specific identification, that sewage lines were contaminated, and that dioxin was found in fish was only slightly probative of the issue of generic causation, was unfairly prejudicial and was therefore excludable pursuant to Fed.R.Evid. 403.

The trial court did not abuse its discretion in excluding the prejudicial references and proffered documentary evidence.

## C. Judicial Control of Witnesses

■ Appellants also assert that the trial court abused its discretion in severely limiting cross-examination, being "solicitous" of defense counsels' experts and unreasonably restricting plaintiffs' cross-examination of Dr. Harbison.[19] However, a court may exercise reasonable control over the mode of interrogating witnesses and presenting witnesses to more effectively ascertain the truth and for other statutorily permitted reasons. Fed.R.Evid. 611(a).[20]

We find that the trial court's control of witness testimony, exclusion of evidence, and limitation of proof was reasonable in light of the complexities inherent in a trial of the liability issue in a bifurcated toxic chemical waste exposure case and did not constitute an abuse of discretion. Appellants' remaining assertions of error in limitations of proof are without merit.

## VII.

Finally, appellants assert error in the exclusion of evidence and testimony regarding subsequent remedial activities or recommendations for remedial measures by government agencies. In spite of voluminous expert witness testimony, plaintiffs claim they had to rely on state and federal government studies and information in the liability phase and that this proffered evidence demonstrated the importance with which the nature and extent of toxic dumping at the landfills was viewed by federal authorities. Appellants argue therefore that exclusion of this evidence was highly prejudicial to plaintiffs' case. As will be

---

19. The trial court merely prevented the Bridges plaintiffs' counsel from opening the issue of inadmissible remedial measures (Tr. at 1613–15) and limited inquiry regarding Dr. Harbison's consulting business to testimony and evidence pertaining to bias (Tr. at 1631–33). Counsel for the O'Dell plaintiffs was precluded from introducing cumulative evidence (Tr. at 1665) and impeaching Dr. Harbison by questioning the "95% probability standard," a recognized basic scientific measure of probability.

20. Fed.R.Evid. 611(a) provides:

The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

discussed later, much of this evidence was received.

■ Subsequent remedial measures are inadmissible to prove negligence or culpable conduct in connection with an event where, if taken previously, the event may not have occurred. Fed.R.Evid. 407.[21] Accordingly, appellants concede that voluntary subsequent remedial measures are inadmissible to prove negligence, but argue that the subsequent remedial activities and recommendations at issue were forced upon Hercules by superior governmental authority or were instituted by a third party, therefore falling within a recognized exception to Fed.R.Evid. 407. An exception to Rule 407 is recognized for evidence of remedial action mandated by superior governmental authority or undertaken by a third party because the policy goal of encouraging remediation would not necessarily be furthered by exclusion of such evidence. *See Farner v. Paccar, Inc.*, 562 F.2d 518 (8th Cir.1977).

Rule 803(8)(C) of the Federal Rules of Evidence[22] permits an exception to the hearsay rule for public records, reports, statements or data compilations, which under specified circumstances indicate trustworthiness. However, "evaluative" reports constitute a controversial area of public records.

Recently, in *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), the Supreme Court held that portions of federal investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state an opinion or a conclusion, as long as the conclusions are based on a factual investigation and satisfy the Rule 803(8)(C) trustworthiness requirement. The Court thus established that evaluative reports are admissible unless the sources of information or other circumstances indicate lack of trustworthiness. The Court reiterates that the trustworthiness inquiry is the primary limitation and safeguard against the admission of unreliable evidence in public reports. This court has previously held that once a report is conclusively shown to be governed by Rule 803(8)(C) because it is comprised of findings of a public agency made pursuant to an investigation authorized by law, the essential inquiry becomes whether the report is trustworthy. *Kehm v. Proctor & Gamble Mfg. Co.*, 724 F.2d 613, 618 (8th Cir. 1983).

■ Analysis of trustworthiness and ultimate determination of admissibility of records, reports, statements or data compilations of public agencies setting forth factual findings from investigation made pursuant to authority granted by law is committed to the sound discretion of the trial court. *United States v. Gray*, 852 F.2d 136 (4th Cir.1988). Therefore, we should review such conclusions under an abuse of discretion standard of review. *Wilson v. Attaway*, 757 F.2d 1227 (11th Cir.1985).

### A. ADPCE Actions

The trial court correctly ruled that conclusions included in the 1982 ADPCE TDS,[23] Plaintiffs' Exhibit 103, were admissible. The TDS was a data compilation within the meaning of Rule 803(8)(C) exhibiting substantial indicia of trustworthiness. Recommendations for remedial measures made in the TDS constituted opinions based

---

**21.** Fed.R.Evid. 407 provides that "[w]hen, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event."

**22.** Fed.R.Evid. 803(8)(C) excepts from the hearsay rule "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings ... factual findings resulting from an investigation made pursuant to (federal) authority granted by law, unless the sources

of information or other circumstances indicate lack of trustworthiness" (parenthetical added).

**23.** The ADPCE found that investigations indicated a continuing likelihood that chemical waste was entering Rocky Branch Creek and ultimately Bayou Meto from the Vertac plant site. In addition, the ADPCE found that Hercules, Transvaal and Vertac buried in the ground and/or stored in approximately 3500 leaking metal drums industrial chemical wastes and by-products of the manufacturing of 2,4,5-T, including dioxin.

on factual findings and were admissible at the discretion of the trial court.

Counsel for the O'Dell plaintiffs was not permitted to inquire as to whether the ADPCE had filed any regulatory actions against Hercules. Tr. at 750–51. Exclusion was a proper exercise of judicial discretion. The trial court correctly determined that filing was not probative of Hercules' liability in the instant case and would have been unfairly prejudicial.

Plaintiffs' counsel attempted to explore whether the ADPCE had taken samples at the Jacksonville sewage treatment plant (Tr. at 760–62) to prove that Hercules had diverted waste water from Rocky Branch Creek as a remedial measure and as an admission of prior negligent conduct. Since Hercules' action was voluntary, the trial court properly considered the line of questioning precluded by Fed.R.Evid. 407.

Inquiry into whether the ADPCE recommended or directed that remedial actions be taken at the plant site was excluded. Tr. at 762–64. Such inquiry would have pertained to actions after Hercules ceased to own or operate the plant site. Therefore, the trial court properly excluded the testimony on the grounds of Rule 401 relevancy and Rule 403 prejudice.

### B. The CDC Report

The 1979 CDC report, Plaintiffs' Exhibit 101, was a study predicting the possible health risks from exposure to soil containing the levels of dioxin found at the plant site and in the landfills. In *Kehm v. Proctor & Gamble Mfg. Co., Inc.*, 724 F.2d 613 (8th Cir.1983), this court considered the admissibility of reports of epidemiological studies conducted by CDC analyzing the statistical relationship between a product's use and resultant injury. The reports were deemed admissible under the investigative public reports exception to the hearsay rule embodied in Fed.R.Evid. 803(8)(C). No showing of untrustworthiness was established. The *Kehm* court also concluded that since the defendant would have an opportunity to challenge the reports' methodology and findings, the refusal to exclude the reports as prejudicial was not an

abuse of discretion. In *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 187 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988), the Second Circuit affirmed a district court's evidentiary rulings admitting epidemiological studies on causation conducted by the government because there was no showing of unreliability. In the instant case, the CDC report did not exhibit any indicia of untrustworthiness.

The trial court correctly required that plaintiffs redact references to voluntary remediation in the CDC report to avoid conflict with the dictates of Fed.R.Evid. 407. The trial court properly admitted the remainder of the report, consisting of factual findings, pursuant to the public record exception to the hearsay rule embodied in Fed.R.Evid. 803(8)(C). Tr. at 2054–59.

### C. The EPA Reports

Plaintiffs unsuccessfully attempted to introduce evidence that the EPA had listed the Hercules/Vertac plant site on the 1985 NPL and thereby had made the site eligible for Superfund-financed remedial action, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601–57 (the "Superfund" law). Tr. at 778–83. The trial court was concerned about the relevance of such evidence to Hercules' liability because the site was listed over a decade after Hercules' occupation and operation had ended. In contrast, the trial court had allowed plaintiffs' expert, Dr. Cranmer, to testify that the landfills were listed on the 1985 NPL. Hercules' potential liability for waste dumped in the landfills did not terminate with the cessation of production at the plant. Hercules had been held formally responsible for the landfill by the EPA. However, the evidence regarding the plant site would have been unfairly prejudicial.

Appellants' argument for admissibility would be strong under Fed.R.Evid. 407, if listing a site on the NPL list required that Hercules immediately remedy the condition. Then the listing would constitute a public agency report setting forth a factual

finding resulting from an investigation made pursuant to legal authority. However, listing constitutes threshold agency action with a limited purpose. Sites are merely listed for purposes of further investigation. *See* 40 C.F.R. § 300.68(a) (1987); *Northside Sanitary Landfill, Inc. v. Thomas*, 849 F.2d 1516 (D.C.Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1528, 103 L.Ed.2d 833 (1989) (listing does not ensure remedial action).

In *Eagle–Picher I*, the District of Columbia Circuit held that the EPA need not determine that a site presents imminent and substantial danger to public health and welfare before the site may be listed on the NPL. *Eagle–Picher Indus., Inc. v. EPA*, 759 F.2d 905 (D.C.Cir.1985) (*Eagle–Picher I*); *Eagle–Picher Indus., Inc. v. EPA*, 759 F.2d 922 (D.C.Cir.1985) (*Eagle–Picher II*) (fact that waste from facilities contains pollutants or contaminants is sufficient grounds for listing). The *Eagle–Picher I* court concluded that the purpose of the NPL was to target certain sites posing a threat to human health or to the environment requiring more comprehensive analysis. Listing on the NPL does not require action by any private party or determine liability. *Id.* at 920. The court concluded that NPL was intended to

> serve primarily informational purposes, identifying ... facilities and sites or other releases which appear to warrant remedial action. Inclusion of a facility or site on the list does not in itself reflect a judgment of the activities of its owner or operator, it does not require those persons to undertake any action, nor does it assign liability.... Subsequent government action in the form of remedial actions or enforcement action will be necessary in order to do so....

S.Rep. No. 848, 96th Cong., 2d Sess. 59, 60, U.S.Code Cong. & Admin.News 1980, p. 6119, *reprinted in* 1 A Legislative History

of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Superfund), Pub.L. No. 96–510 at 367 (1983). In *Eagle–Picher II*, the court of appeals accepted the EPA's argument that only relative certainty that a specific site might someday be eligible for fund-financed remedial action was required to justify inclusion on the NPL. *Eagle–Picher Indus. Inc.*, 759 F.2d at 932.

In the instant case, since remedial action (i.e., clean-up) had not commenced pursuant to the direction of superior authority, evidence that the plant site was included on the 1985 NPL was therefore prejudicial, irrelevant, of no probative value, and was properly excluded. We find no abuse of discretion.

 Plaintiffs also unsuccessfully attempted to introduce "health assessments" issued by the EPA[24] in October of 1985 regarding the landfills. EPA reports are generally admissible under Rule 803(8)(C). *United States v. Northernaire Plating Co.*, 670 F.Supp. 742 (W.D.Mich.1987), *aff'd*, 889 F.2d 1497 (6th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990). However, EPA reports must survive a trustworthiness inquiry. *See Swietlowich v. County of Bucks*, 610 F.2d 1157 (3d Cir.1979).

The Rogers Road report explicitly qualified its conclusions by stating that "there are severe limitations on the data provided for review" and placed a caveat at the beginning of the discussion of data that

> [i]nsufficient information was provided to assess the accuracy and validity of the analytical results from the soil, water, and "high hazard" (drum) samples. According to Doc. I, "the data from the air sampling is of limited value." The following comments are made with these limitations in mind.

Plaintiffs' Ex. 101–1 through 2(a) at 2.

The Graham Road report also explicitly qualified its conclusion. ATSDR wrote

---

**24.** The Department of Health & Human Services, Public Health Service, Agency for Toxic Substance and Disease Registry (ATSDR) issued health assessments of the Rogers Road dump site, dated October 25, 1985 (the Rogers Road report) (Plaintiffs' Ex. 101–1 through 2(a)), and the Graham Road dump site, dated October 23,

1985 (the Graham Road report) (Plaintiffs' Ex. 101–135 through 142). The reports gave a background summary, specified evidence reviewed, discussed observations, drew conclusions and made recommendations for remedial action to be taken. Plaintiffs' Ex. 101.

that "[m]ap exhibits, enclosures, and ground water data were missing from the material submitted." Plaintiffs' Ex. 101–135 through 142 at 1. The report expressed "serious concerns about the validity of the laboratory results and the overall laboratory Quality Assurance/Quality Control data provided for review." *Id.* at 2. A significant number of sample results had qualifiers attached stating that samples were not within control limits, duplicate analysis was not within control limits, and data was recorded below detectable limits. Due to the large number of qualifiers, the report expressed reservations about the validity of all the samples analyzed. The report indicated that the data was confusing because of the improper labeling of units, lack of labeling, inclusion of different data sheets and misplacement of data. The report theorized with great concern that maximum concentrations over the tested periods may not have been obtained. The report could not verify certain findings. The analyses were problematic in quality control and, therefore, the report recommended that certain samples be reanalyzed. The report concluded that the data was suspect. The report recommended that values be confirmed with additional samples, and improved quality control. The report indicated that the

> finding is based upon: the poor quality of the sample results provided for review, certain compounds only being estimated and tentatively identified, missing map exhibits, lack of information provided on sampling procedures, insufficient number of samples of surface drum wastes and contaminated soils surrounding the drums, and lack of on-site characterization of potential subsurface and ground water contamination and buried drums.

*Id.* at 7.

These ATSDR assessments constituted expert opinion testimony which was admissible or inadmissible at the trial court's discretion and facially exhibited substantial indicia of untrustworthiness. We find no abuse of discretion in the exclusion of the reports.

### D. Post–1976 Remedial Actions

Remedial measures subsequent to Hercules' occupation of the plant site were properly excluded but not on relevancy grounds. Though Hercules had not occupied the site since October 1971, liability under CERCLA attaches to

> (1) the owner and operator of a ... facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party....

42 U.S.C. § 9607(a)(1)–(3) (1980). Since under CERCLA Hercules would be potentially liable for conduct (i.e., dumping of toxic chemical waste, chemical releases) occurring until 1976 as an "owner or operator," remedial actions by Vertac aimed at conditions created prior to 1976 were relevant. Post–1976 actions, not related by specific evidence to a condition created by Hercules, were irrelevant and prejudicial.

Dr. Harbison was not permitted to testify in detail regarding the EPA FIT's investigation of the Graham Road landfill in 1985 because such testimony would pertain to subsequent remedial measures. Tr. at 1613–15. Hercules had not owned or operated the plant site since 1976. No evidence was offered to connect Hercules with conditions existing three years later (i.e., drums were not marked). The investigative report itself was inadmissible under Rule 803(8)(C), due to its untrustworthiness, since timeliness is a factor in any trustworthiness inquiry. *In re Multi–Piece Rims Prods. Liab. Litig.*, 545 F.Supp. 149, 151 (W.D. Mo.1982) (citing *Fraley v. Rockwell Intern. Corp.*, 470 F.Supp. 1264 (S.D. Ohio 1979) (Rubin, J. Carl B.)).

Plaintiffs' expert, Dr. Cranmer, had testified to the facts surrounding the 1985 FIT investigation. Therefore, plaintiffs had an opportunity to introduce any relevant and unprejudicial evidence pertaining to causation.

Plaintiffs' additional claim that their cross-examination of defendant's expert, Dr. Harbison, was unfairly limited resulting in prejudice is unfounded. Plaintiffs' attempt to impeach Dr. Harbison was not impeded by the trial court's refusal to allow Dr. Harbison to testify to subsequent remedial activities subject to Rule 407 preclusion.

The trial court also properly excluded information on Vertac's post–1976 remedial actions at the plant site. Vertac was a nonparty at the time of trial. Evidence of Vertac's actions, after Hercules' occupation of the site had ceased, was unfairly prejudicial to Hercules and there was no abuse of discretion.

Plaintiffs were prevented from inquiring on redirect as to the contents of a report prepared in 1980 for Vertac by plaintiffs' expert, Dr. Morris Cranmer. Dr. Cranmer had testified at length on cross regarding the report without referencing inadmissible remedial actions. Therefore, the relevant portions of the report (i.e., factual findings pertaining to potential liability) was admitted and inadmissible evidence of subsequent remedial measures was properly excluded in the trial court's discretion as cumulative. Fed.R.Evid. 403. Appellants' remaining assertions of error in evidentiary rulings are without merit.

## CONCLUSION

In summary, we find that the trial court did not abuse its discretion in bifurcating the issues of liability and damages for purposes of trial, nor did appellants properly preserve this issue for appeal. Furthermore, there was no abuse of discretion in excluding irrelevant or prejudicial evidence, and limiting proof in the liability phase. We conclude that the trial court did not abuse its discretion in denying plaintiffs'

motion for a new trial. We affirm the order denying a new trial.